Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. This is, as you might be aware, an unusual case in the sense of the number of lawyers involved, number of defendants involved. I want to just take a minute to go over what the Court understands to be our housekeeping rules this morning. Of course, each side has 45 minutes. My understanding is that Mr. Coleman, representing Milheiser, Johnson, and Williams, will have 24 minutes. There's no set specific time for rebuttal, but I'm told that whatever is not used will be used for rebuttal. Ms. Windsor, representing Mr. Brightman, has 7 minutes. I'm told that there will be 2 minutes of rebuttal. Is that correct? Okay. Mr. Kovach, and I apologize if I misspelled or mispronounced anything here, representing Francis Simica has 7 minutes, reserving 3 minutes for rebuttal. And Ms. Boyce, representing Appellate Verag, has 7 minutes and has 3 minutes of rebuttal. Now, as you know, these things tend to run out. I'm not going to let that happen today. If the Court has questions, that's different. But when your time is up, I'm going to end the discussion, okay? So please don't be surprised. I'm not trying to be rude. We know you have a lot to say, but we have, of course, read your briefs, we've read the record, and are prepared to hear your argument. The United States, represented by Mr. Srinivasan, has the 45 minutes, of course, and we'll hear from him. There's no rebuttal issue involved there. So I guess Mr. Coleman can start. Is that correct? Yes, Your Honor. Good morning. Good morning. And as far as the housekeeping, the one thing I was going to say is my plan was to focus on the joint issues in the joint brief and the first three issues of the joint brief. However, if the Court had questions about customer complaints, Ms. Windsor was going to handle that in her section of the argument. If the Court had questions about sentencing, Ms. Boyce was going to handle that in her section of the argument. And if the Court had questions about Brady, Ms. Ferrantino, who's not planning to argue, but she's here, she's our Brady expert,  that's all fine. But from the Court's perspective, we're not going to micromanage that. However you want to handle it individually, all I'm saying is that the Court is going to look at the clock. We're going to hear what you have to say. Now, obviously, if any member of the panel has questions that go beyond the time, then the timing is not a factor. But I just wanted to caution you in advance. We have some of our colleagues who permit people to go on from my perspective ad nauseum. That's not going to happen today. So I just want to be fair about that. Okay, please proceed. And I will begin with the first issue in the joint brief, which is whether the government's fraud theories were overbroad and whether the jury was allowed to convict under an invalid theory. I call this sort of the Yates claim. And we believe that, and I think the easiest way to look at this is that of the two misrepresentations that the government is alleging, if we look at the first one, which I'll call the regular supplier misrepresentation, that there is a venerable Second Circuit case called region office supply, which is very closely on point, which makes clear that that type of misrepresentation is not sufficient to constitute fraud. It doesn't have a sufficient sort of potential economic harm as to the victim, and that that alone is insufficient to establish fraud. Both the jury instructions… The case you're referring to I think is a little different than this, and correct me if I'm wrong, because here you have a situation where arguably none of these people would have spent anything but for the call. So the government's theory, if I understand it correctly, is that they would not have partnered with money but for the calls. It's not just a fraudulent call. That's different. What am I missing? Well, I think in region it was the same thing. The people, the victims, alleged victims in that case, they would not have bought the office supplies if they hadn't received a call from somebody saying, hey, we know your executive in your company, or we know a friend, or something like that, which was a similar thing. I think it was the same thing, that they would not have spent money had there not been this misrepresentation. And it's not just the Second Circuit case. This court in a case called Brookhausen reached a similar conclusion. In that case, the victims sold their property to the defendant. The defendant had made misrepresentations about what he was going to do with the property. The victims maintained they never would have delivered their property. They never would have let it go had he not made the misrepresentation. And this court still found that just because the alleged victim partied with property, that does not mean that it's fraud. Mr. Coleman, suppose somebody takes their car to a mechanic, and the mechanic says the brake pads are worn, they need to be replaced. And he then, in fact, puts in new brake pads at the agreed upon price, but the old brake pads were perfectly fine. He was lying when he said they needed to be replaced. Has the owner in that case been deprived of money or property? I think potentially yes. And that's because they were deprived of the benefit of the bargain, so to speak, in that they thought they needed new brake pads. I mean, they had sufficiently usable brake pads. They weren't worn out, and so they kind of paid double that they should have because they already had a… So why isn't that exactly what the government alleged here, that the victims here were misled into believing that they needed to buy toner? In fact, they didn't need to buy it because they were already getting it for free from the regular supplier. And so they were tricked into paying for something they otherwise wouldn't have paid for. Well, I think the government would have a better case if that was the theory. But the problem is that that might have been one of their theories, but there certainly was very little evidence to support that theory, and the jury was not required to convict on that theory, and the government argued additional theories. And that's our problem, is that if that is a valid theory of fraud, that's not the only theory they proceeded on. They also proceeded on a theory, and I can give you an example with my client, Mr. Milheiser, the one alleged victim that testified against him. She didn't say that, oh, I was getting free toner. She specifically said she wasn't getting free toner. She had to buy it through Office Depot, and that's the way she was doing it. So the problem we have here is that if that is a valid theory, it's just that that doesn't sort of require the sustaining of the verdicts here because there were other invalid theories that went to the jury, and the government's theory wasn't solely based on that. And that's why we think we have a Yates problem here. Wasn't there expert testimony, though, that in this industry, the typical contract was to include toner in the copier contract? I don't know if the testimony was typical, but there was testimony, expert testimony, that some people received free toner through their copier service, but that certainly I don't think was typical. I mean, most of these victims, if not all of them, testified they weren't getting free toner. They were, and I can tell you, I can guarantee you the one from Mr. Milhiser, she specifically was not getting free toner through her copy company. She was paying it from Office Depot. And so even if, but even if there was sufficient evidence to justify that theory, the problem we have here is that there were additional invalid theories that were presented to the jury, and certainly under the jury instructions, the jurors were not instructed that they have to find that the victims would otherwise have received free toner. There was no jury instruction to that effect. The government, in its closing argument, made alternative, they said you can convict under the regular supplier pitch, or you can convict under the price increase pitch, or a combination thereof. There was no argument that all the victims and that the jury have to find that they would have otherwise received free toner. Well, I mean, you just mentioned the price increase or the inflated price pitch. What's wrong with that? I mean, isn't it just a matter of degree? I mean, if you pay for something that you wouldn't have paid anything for, that's obviously a deprivation of money. But if you pay more for something than you would have paid if you had known the truth, I mean, that's a smaller deprivation, but isn't it also a deprivation of money? Well, if it does go to the benefit of the bargain, it may be a fraud. But we don't have, in this case, clear evidence that any particular victim, and I'll just use an example of the victim that testified as to Mr. Millheiser, she didn't claim that the price was a ripoff, that she was paying too much for her toner. Her only complaint was that eventually she felt that she was getting too much toner, and she told them to stop, and then they stopped. But she didn't claim that she was paying too much for the toner. And, again, the jury instructions in this case – If she's getting too much toner, doesn't that suggest that she was going to be getting toner without this additional purchase? Like, she only gets too much because now she's getting more than she needed, which is – isn't that the point, that she wouldn't have needed this toner at all? Well, once it got to the point where she said, I've already got enough, I don't need any more, stop sending the toner, they stopped sending the toner. So – and there was no testimony that, oh, I never used any of that toner, there was no way we ever could have used any of that toner. She just said at some point, we had enough toner, stop sending us toner, and they stopped sending the toner. And if there had been jury instructions that said, for example, you have to find jury that the victims were ripped off, that they paid absurdly high prices, then maybe there would have been a sufficient basis to conclude that the verdicts are correct and are legally valid. But the problem is we had no jury instructions that required them to pay prices that were too high. There was no requirement that they have to agree that both pitches were made and that they paid unusually high prices. And because of those defects, we have what we believe is a Yates problem, and I know Your Honor is obviously very familiar with Yates, that the jury could have convicted under an invalid theory. Can I just ask you one question, point of clarification here? You've made a distinction between those victims who were not getting free toner, like the Millheiser person who went to, I think you said, Home Depot, and those who did. For purposes of our analysis of whether an adequate crime has been charged, does that make any difference? Does everybody have to have the same situation, otherwise either all free or part free, part not? How does that work? Well, if I think I'm understanding Your Honor's question, I guess the court could look at it in a harmless error analysis and try to look at the evidence as to each defendant and say, well, was there evidence that this particular defendant's victims were getting free toner? And then once you take a look at that, then maybe you can determine whether the error in this case was harmless or not versus other victims who clearly were not getting free toner. That's my point. I gather you're saying we have to basically take it victim by victim and determine whether they were getting it for free, which would go to the money and property concept, or they weren't and it just stopped when they had too much. I think that could be part of the harmless error analysis here. I think the court's going to have some serious problems with that, though, in that, number one, I don't think you're going to find with any of these defendants that there were victims who testified that they were getting free toner. Number two, the way the case was presented, it was just sort of presented in this sort of globalized theory that I think it's going to be really hard to segregate defendant by defendant, victim by victim, who was receiving free toner and who wasn't. And if you look at the government's answering brief, they didn't do that in their answering brief. That wasn't part of their harmless error analysis. They didn't break it down defendant by defendant, which victim were they related to and which ones got free toner. And I don't think the court should be saddled with that burden. The government has the burden of showing harmless error. They didn't offer to do that in their briefs, and I don't think the court should be obligated to sift through the record and try to delineate each defendant to each victim and then look and see whether they were a free toner person or not. I think at the end of the day... I was remembering, and I think the question is, are you familiar with the terms of a typical agreement that they would have with their customers, the end users? This is at ER 5778, and they say a little bit about it. There's like a little bit of dialogue in between, and then the witness expert says that the supplies, the service, the parts, would be wrapped in a single price that's often referred to as a click or a per page, so the customer would be paying one price on a per page basis that would include supplies, service, and parts. And I think he's saying... Okay, so maybe I should have read a little bit more, but he also says that the toner is part of this. So I don't understand how you're saying that's not what he said was the typical contract. Well, let's assume he did say typical. He used the word typical. There's overwhelming evidence that a lot of these victims didn't have that quote-unquote typical contract. And, again, I'm most familiar with Mr. Milheiser because that's my client. I have Valdivia at 4804. It was included in our service package. We didn't have to pay for it. Warakomsky at 5150. It was included in our service contract, asking about paying for the toner. Ginize at 5154. We had a monthly payment for the contract that included toner. So, I mean, what do we do with that then? Well, and that's what I'm saying. You can try to look at those particular victims and try to link them up potentially with specific defendants and then try to fold that into your harmless error analysis. What I can tell you from Mr. Milheiser is that none of those victims had anything to do with Mr. Milheiser. There was one alleged victim. But he made a lot of money beyond that one victim, right? Like why couldn't the jury from this evidence, including the expert testimony, think that the typical thing was toner was included, so at least a lot of these victims, when you get to the profits, had this kind of contract, and that's enough to say there was fraud. Okay, and if the court believes that that's sufficient evidence, okay. I disagree, but assuming that's the case, our point is that there was the potential that jurors convicted under an invalid theory. The jurors did not have to find, both pursuant to the government's arguments and pursuant to the jury instructions, that a particular victim was receiving free toner. That wasn't required. So our position is that if the court finds that the evidence was sufficient, I understand that based on that testimony, but that there is a possibility, and indeed a very strong possibility, when you look at someone like Defendant Milheiser, that the jury did not find that the victims were receiving free toner. If the jury had been instructed in that way and it had been made clear to the jury, then we might be here on a different record and a different footing. But our position is that there is a serious possibility in this case, based on the arguments and the instructions, that jurors convicted under an invalid theory. So part of the instruction was, the defendant knowingly participated in a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. What do you think the jury could have thought that meant, that still supports your idea that they didn't find that these people were paying for toner they didn't need? Well, I think it's the exact region office problem. The jurors could have found that there was a misrepresentation, let's say, about being the regular supplier. It didn't go to the benefit of the bargain. There was no potential economic harm, and these are things that we believe are required for fraud. Well, they had to get money or property on that, what I just read. So some economic money went. And I think that's the point of cases like Brockhausen, Sadler, which is Judge Sutton's opinion for the Sixth Circuit. Simply delivering money or property, and even if there's a deception, that doesn't constitute fraud. And Sadler is another example. In Sadler, it was undisputed that the defendant made misrepresentations to the pharmaceutical suppliers who were selling her pain pills. And she said, she gave a fake name and said, I'm using these pills for indigent patients. Total lie. It was not true at all. But when the pharmaceutical companies delivered their property, they relinquished their property based on that deception. She paid the full price for those pills. And Judge Sutton for the Sixth Circuit said that's not fraud. That they got the benefit of the bargain. They got their pills completely paid for. And that's what we're arguing here. Simply turning over money, obtaining money, that in and of itself, and even if there is deception, that is not fraud. There has to be a compromise of the benefit of the bargain. There has to be a potential economic harm, injury, to the victim in order for it to be fraud. And the jury was not given those type of instructions. The theory that was presented was overbroad and would have allowed convictions based on a region office supply or a Sadler or a Bruckhausen type theory. And if there are no other questions, I'll save the remaining time. What do we do with the fact that, I mean, you mentioned Yates, right? In Yates, the instructions themselves were fine. The problem was that the government had said, you can find money or property on the basis of deprivation of accurate information or various other things that weren't valid theories. But here, I mean, the very beginning of the government's closing argument, they said, you're selling overpriced toner to people who are getting it at no extra charge. Looking at the argument in the context of the instructions, it seems like the focus of the government's theory was a theory that you're acknowledging was a valid one. Is that wrong? Well, I think, I agree. There are some comments like that in the closing arguments. But then there are other comments where they simply say, well, just one misrepresentation is enough. There's, I mean, if you look at the witnesses, and again I go to, for example, Vera Babb, who was Mr. Milhiser, she didn't claim that she was paying absurdly high prices for the toner. So when you look at the witness testimony, when you look at some of these other arguments made by the government, and then when you look at the jury instructions, and I know, Your Honor, it said, I at least read Yates as being somewhat critical of the something-of-value language in the jury instruction, which is incredibly broad. And that's language that was used in this instruction. What is something of value? That could be economic information, which Yates says is not good enough for fraud. Guert in the recent D.C. Circuit case says it's not good enough. Sadler, and I think Simonelli ultimately from the Supreme Court, that something-of-value language, which was the language that was used in this jury instruction, is so broad, and then when you combine that with the arguments that were made in closing and some of the witness testimony, when you combine all that together, there is a serious possibility that the jury returned a verdict under an invalid theory. Okay. That's the remainder of your time. Very well. I believe next is Ms. Windsor. You're going to try to reserve two minutes, right? I am. I'll see how I do. Good morning. My name is Katherine Kimball Windsor, and I represent Jonathan Breitman. My plan was to start with the sufficiency argument as to Mr. Breitman, but I'm also happy to answer any questions about the complaints claim that was filed in the joint brief. Just starting with Mr. Breitman's sufficiency argument, there was one customer witness who testified against Mr. Breitman, Antoinette Sanders, and she really demonstrates what Mr. Coleman just said. She testified that she got a call from someone selling her toner and that her office needed toner. She testified that the price sounded less than what she had been paying in the past. She was an experienced office manager. She'd been working in this same office for 20 years. She thought it was her normal supplier, not because of something that the caller told her, but because it was the time that her office needed toner. And so that's why she placed the sale. She did not say that she had a contract with her regular supplier. She said she had an arrangement with her supplier, but there was no information about what that arrangement was. And, again, she needed toner at the time, so it wasn't a question of her having too much. And the reason that she discontinued ordering, she did place repeat orders, but eventually she discontinued them because the price kept going up. So that original hook price did not stay the same, and at that point she became dissatisfied. And that was the main evidence against Mr. Breitman's company. She did say that they were already receiving toner from Conica, their supplier, though, right? I don't think she said those. Under that arrangement, did you already receive toner from Conica? We did, yes. That's at ER55.8. Okay. So they had this arrangement, but she said that they needed toner at the time. Right. It seems like they were waiting for their shipment from Conica or whatever, but it seems like they were getting toner from Conica. She did say, however, though, that this was less than the price that she normally paid. It sounded like a good price to her. There was nothing in the record about the price. In general, I mean, there was some evidence of price, and Your Honors mentioned the expert witness. The expert witness came from one company, Lexmark, and there were a lot of other copier companies. His testimony wasn't really focused on that price issue, although absolutely he did touch on it, but that wasn't the focus of the testimony. And so just coming back to Mr. Brightman. But the testimony by the expert was about what was typical in the industry. I mean, maybe you could have said that was not admissible somehow, but it seems like it was admitted that he was an expert on what was typical in the industry. From the wholesale, he didn't do what our clients did, which was the retail side of things. He was experienced. He came at it from this Lexmark. But I don't think, I mean, did you move to exclude him because you didn't understand how contracts worked? I mean, he testified about what the typical contracts were. No, and I don't dispute that that's what he testified, but just to put it in context that this was about one company, how the company that he, you know, he had been in the industry, and he certainly was aware of how the wholesale industry worked. And, again, we don't dispute that some people did have contracts with these companies. And it wasn't, you know, it's a little misleading to say they were getting it for free. I mean, they were paying for this contract. Right, I mean, they were paying an amount per page, but the amount per page included toner. So they, anyway, it wasn't separated out, but they were getting toner without paying more than what their contract was. In this case, with the witness who testified against Mr. Brightman, though, you know, she did testify that it was a good price and that they needed toner, and she didn't have any problems with the transaction. But, I mean, doesn't it sound like she didn't really know what was going on, though? I mean, if she was usually getting toner as part of her contract, which she also says, then it's, I mean, she says she thought it was a good price, but that sort of doesn't even make sense. I mean, I think that what the government is asking is for us to speculate and to say, well, she must not have meant what she said, that she must have, that there must have been some misrepresentation because she thought she was dealing with her regular supplier. That's not what she said, and I think we have to look at her exact words where she says, I thought I was talking to my regular supplier because it was, we needed toner. Right, no, I understand that, but when she says that it seemed like a good price, I mean, that part doesn't really make sense in light of her other testimony that the toner was already coming in the contract she already had. I mean, I don't know. She didn't talk about that. She talked about an arrangement. There weren't any details about what that, how that worked, whether it was a contract where she got, you know, toner included, you know, or how it was. Balance of your time. Yes, I will. Very well. Thank you. Okay. So now is it Kajoyan? I apologize. That's much better. Thank you. Kajoyan. Thank you, Your Honor. Sean Kajoyan. I represent Francis Sameka. I'd like to reserve three minutes for rebuttal. Francis Sameka was convicted of two counts, one the conspiracy count and one substantive mail fraud count. As to that, as to any victim that came and testified at trial, no one said that Sameka's company supply distribution resulted in them being a victim or parting with money. In fact, the only victim that the government alleged related to Mr. Sameka was Kaiser Retirees. But the Kaiser Retirees witnesses only described contact with a company and a fax confirmation related to coastal distribution, not Mr. Sameka's company. Mr. Sameka had no connection with coastal distribution and no fax confirmation,  was put into evidence that connected Mr. Sameka or his company to any victim. Wait a minute. Wasn't the, I want to get this correct, Palazola's check combined with Shadwick's testimony and Fisher's testimony enough to convict your client of mail fraud? No, I don't believe so. The victim's testimony, Palazola and Shadwick, yes, they testified about sending money and the government's spreadsheet, which was Exhibit 50, showed an IDC internal spreadsheet that showed that the check from Palazola and Kaiser Retirees, part of that was paid to Sameka's company supply distribution. Doesn't that undercut the argument that you just made? No, because it doesn't necessarily show that Mr. Sameka or anyone at his direction made any false statements to the victim. The fact that IDC Servco might have paid a portion of the money to my client's company may have been a mistake on IDC Servco's part. There's no one that testified, including Mr. Feldman, that IDC Servco's spreadsheet was 100% accurate, that it must have been that a false statement was made by Mr. Sameka or his employees in order to cause this victim to send money to IDC Servco and then for them to send it to supply distribution. So that's those two victims. So neither of them said anything about Mr. Sameka making any false statement or Mr. Sameka's employees making any false statements to them. And as I explained, there was no fax confirmation from Mr. Sameka's company to them or signed by them. It was only coastal distribution. This discussion, IDC Servco, the money from them to Mr. Sameka, it's frankly pure conjecture to say that that... So the check just disappeared, there's no reason for it, nothing to tie it to the company. That's illogical, is it not? Well, no, because there were many checks that came from IDC Servco to supply to Mr. Sameka's company. But the government's allegation, and it's their burden to show, that that check was a result of this fraud and it really was insufficient. And that's certainly my argument that it was insufficient, it's speculation. So basically it all boils down to you think just the evidence is insufficient. Not that there's no evidence, it's just insufficient. Is that correct? Let me rephrase it more correctly. That the evidence was speculative and no rational juror would have found that that evidence was sufficient to convict Mr. Sameka of those crimes. You want to save the balance of your time? Yes, sir. It goes quickly, I know. Thank you, Your Honor. Very well. All right, so next we have, you said Voights, is that correct? Good morning, Your Honor. May it please the Court. My name is Anne Voights and I represent Sharon Virag. I'd like to address two things. One on behalf of the group of defendants, the sentencing issues. And on that, the one issue I wanted to raise, aside from what I've already introduced. Just a little bit, please. Sure. Just better? The one issue I wanted to cover with sentencing was the impact of this Court's grant of en banc review in U.S. v. Lucas. While the panel certainly could hold a decision pending a decision in Lucas, we don't believe it needs to because the government has not argued here that clear and convincing evidence is not a standard that should be applied in any case. They simply argue that it shouldn't apply in this case. And second, because we think that this Court can conclude that the evidence that the government put on under any standard was not sufficient to warrant the enhancements for the defendants. Can you explain the first of those points? Are you suggesting that if Lucas were to say, if Lucas were to abrogate our cases about clear and convincing evidence, that the government has forfeited an argument that it would benefit from the potential hypothetical new Lucas rule? Yes. It has not raised that argument here. It's the same office that has raised it. I think it was a footnote. I can't remember exactly. But I thought the point was to preserve the argument. They were trying to preserve the argument that they don't think the standard should ever apply, right? I mean, maybe they didn't work. Do you remember where that is in their brief? I will check, Your Honor, but I don't think it was sufficient to preserve the point. But why did they say it if they weren't trying to preserve the point? I think they were, but I think it was not enough in this case. And regardless, even if this Court agrees that they have preserved it and that it should hold it, we point out that if the Court concludes that this wasn't enough, even under a preponderance standard, it could grant relief nonetheless, that it should only hold it if it believes that the difference in the standard applied makes a difference here. And the defendant's position has been that whether the Court applies a preponderance standard or clear and convincing, the evidence was not sufficient to uphold such significant enhancements, that essentially the government used evidentiary shorthand to get past an enhancement that amounted to roughly $25 million for all the defendants without sufficient detail or explanation. And that's your primary argument, that this is insufficient evidence, right? Yes, that is it. And with respect to Ms. Virag's individual claims, I was hoping to address the issue of the sufficiency of the term. I'm certainly happy to answer any other questions the Court might have about sentencing, though. Do you want to hold the balance of your time then? If I could address very, very briefly the issue of the sufficiency, because Ms. Virag, the evidence against her was arguably the thinnest against any of the defendants. No witness testified about her. The only testimony about her in the government's case came from Mr. Feldman, who said that he had seen her briefly at luncheons. But he didn't testify that she was present when there were discussions of this. The government's evidence that they point to are the fact that she got a price catalog and that she received a memorandum in which Mr. Michaels told them that they needed to not engage in lax sales practices. Yes, but he also said, you know, this is putting us all in jeopardy, right? There's an innocent interpretation of that, but there's also a not-so-innocent interpretation of that. And in this context, we have to draw the inferences in the government's favor, right? So why isn't that plus evidence of attendance at meetings in which we don't know what these particular meetings were, but we know from other evidence that in general the meetings were used to coordinate the conspiracy. So why isn't that enough? I think because, again, as she testified, when she went, there was just recognition. There was no discussion of malfeasance that she testified to. And there was no one else who connected the link between being at the luncheons and what was actually discussed when she was there. And you think so alone, that's a very thin reed on which to hang a conviction, particularly here where no victim testified about her or about her company, and also where the only evidence that the government points to now is, again, very, very thin. A price catalog supports nothing more than that she received a price catalog that told her what prices to charge. And there's no evidence that actually supports the idea that she believed her benefits probably depended on the success of the entire venture, that this was a conspiracy, a single conspiracy, as opposed to multiple ones. With that, I see I'm down to two minutes, so if I could reserve my time. Thank you, Your Honor. Very well. All right, so, Mr. Svinovasan, I guess you have the full 45 minutes, so... Thank you, Your Honors. Good morning, and may it please the Court. Rajesh Svinovasan for the United States. The defendants used a deceptive telemarketing scheme to cheat their victims out of money. That's a classic example of fraud, and the jury agreed. After several weeks of trial and hearing from over 30 witnesses, the jury convicted the defendants of mail fraud, mail fraud conspiracy, or both. Those convictions, as well as the defendants' sentences, should be affirmed. Unless the Court wants me to start elsewhere, I'll start with the prosecution's theory of the case. This is a case about tangible money being taken from real victims as a result of deception. It's not a case about intangible rights. And the scheme worked like this. First, the sales companies would find out information about the model number of the printer and other relevant information, because if you have that information, people would assume you're their regular supplier, and people trust their regular suppliers. And then, when they would call the victims, they would give this price increase pitch. They would say, we didn't send you a notice, prices have gone up, but if you place an order right now, you can lock in at that lower price, which testimony at trial showed was absurdly high. And the expert testimony, I think, sufficiently establishes that. Can I just ask you, I want to be sure I read it correctly. I think it said it was like three to six times higher. Is that correct? I think it's up to five times higher. Five times higher, that's a lot. I mean, was there any testimony questioning whether that was an accurate description of how much the prices varied? No, and I was going to say that I don't think the defendants disputed at the trial level that it was an absurdly high price. I think their argument was they saw the price and they decided to pay it, so there was no deception. There was no cheating. And that is wrong. For the prosecution theory of the case, I want to emphasize this case is... I had not understood that we needed to agree with you that the price was so much higher for you to have your theory. I thought your theory really depended on they were buying toner they didn't need more than a particular price because some of the witnesses seemed like they didn't think the price was too high. Maybe they were just wrong, but do you need that part about it being too high? No, we don't need that part about it being too high. For the money part of the mail fraud statute, it's clear that money changed hands. The high price, I think, goes to the intent of the fraud. No, but the money changing hands by itself isn't... because money changes hands and in honest services cases, somebody's getting paid for their services that are not being rendered honestly, so the money isn't enough by itself, right? You need something more than just that, right? I would agree. What I would say is the money element can be put aside and it's really intended to fraud what we're talking about. You need to prove that the money transferred hands because of deception. But then how do you account for a regent office supply? Because there, we're the boss's friend or we have some relationship to you and that was a lie and they would have bought from somebody else and so the money changed hands because of that deception, right? I don't think regent is applicable and I'll start by saying that regent comes in an odd procedural posture. There were stipulated facts that the government submitted. It was barely a case or controversy. As a result, there were no victims to testify about being cheated out of their money. Here, there were many victims who testified about being cheated out of their money. So are you just saying regent is wrongly decided? I'm not sure what you mean. I don't think it's wrongly decided, but I think the court in that case acknowledged that there may be a different case with different facts if they're real victims who testify. That would be sufficient. It's just on these stipulated facts, it wasn't sufficient. So it's not that I believe regents wrongly decided necessarily, although this court is not bound by it. It doesn't need to follow it. But our theory of the case is perfectly consistent with regents. How would you distinguish the facts in this case from the facts in regents, as those facts were stipulated? I would distinguish it in three ways. First, there was no materiality in the statements, and this court has said that is the interpretation of regent. In the United States v. Toronto, the court cited regent, explained it, and said the statements in that case weren't material. Second, no victims testified. There was no provable harm, and while harm is an element of the statute, it does go to intended of fraud. I think the regent court said the fact that someone is actually victimized is pretty good evidence that there was intended of fraud. But there wasn't any of that because there were no victims in the case. So I would say for those reasons, regent is inapplicable. I'm a little confused. Maybe I don't remember the exact wording of regent, but people said that they bought these things because they were told the person was related to the boss, so there were victims in some sense. What do you mean by there were no victims? No, I don't believe any actual victims testified. Well, that may be, but the stipulated facts presume that people did this, so there were victims in that sense. I'm not sure why it matters whether what they would have said was stipulated versus having them testify. There's a difference between but-for cause and materiality, I think. So the kind of lies they were telling in that case, someone referred me, I have too much stationery, those aren't the type of things you would rely on in deciding whether to purchase it. Simply because someone has stationery doesn't mean you have to purchase it, even if that's the reason why you end up talking to that person. So I don't think there was a link between the money-changing hands and the deception. But even otherwise, I think reason is distinguishable because nothing about the lies went to the nature of the bargain itself. And here, the lies did go to the nature of the bargain. It's clear with price, how that went to the nature of the bargain, but it's also clear with the regular supplier pitch, why that went to the nature of the bargain. People trust their regular suppliers. If you have an ongoing business relationship, you expect to get a call from them, and you expect them to give you a fair price, and you expect them to meet your needs and not oversell toner to you. That's why they needed to use that pitch to get to these victims. Multiple boiler room operators testified at trial that if you didn't come in with some information to imply you were a regular supplier, they wouldn't trust you, they would hang up. In fact, they targeted people who wouldn't ask questions. As soon as someone asked a question, they would hang up the phone and try to find someone else. They were looking for people who were too busy to care about the price or to think hard about whether they needed toner right now. That's part of the brilliance of... Sorry, just a minute. How do you... I mean, I appreciate the, like, you know, you're somebody I trusted, and I wouldn't have dealt with you if I didn't trust you, but what about Guertin from the D.C. circuit? I mean, there it was, you know, if we had known that you lied on your SF-86, we never would have hired you, right? And we're paying you money each month, right? So how is that different? One way it's different is this court has recognized... Yates recognizes that salary is not quite the same as money or property in a property interest. That's... Okay, but the salary is money, but... Okay. That's the way I would distinguish it. There's no property right in a job position. And Yates makes that pretty clear. Even if people were lying in order to keep their jobs, keep getting their salary, that wasn't a sufficient property interest. So that's how I would distinguish that case. If I said to you that the government's case is a close one, it's not 100%, what would be your response to that? I don't think it's a particularly close case because it falls in traditional mail fraud. This is not a case about intangible rights. It's not a case where we named our property interest as something other than money. The... Whether the evidence was close or not, the jury decided that each of these defendants should be convicted. And on the deferential review that this court's conducting, I think that's sufficient. I also want to make clear that confirmation forms do not immunize deceitful conduct. The defendants have made an argument that because they sent a confirmation form that listed the price and had a small print on the bottom, we're not affiliated... We may not be affiliated with their regular supplier. That was enough. That's not true, and the Weaver case from Second Circuit proves that. It was the same thing there. After the deceptive pitch was made, a contract was sent with truthful disclosures, and the court said, once the deception is done, that's the crime. The crime for mail fraud is not the actual taking of money. It's the scheme to defraud. No money actually has to ever part hands. May I ask you this? As the government well knows, there was a consent decree, in effect, from the FTC from, I guess, actually two different time periods. What role, if any, does the existence of that consent decree and the disclosure about portions of it in the material that was sent by the defendants, what role, if any, does that play in our analysis of whether you've proven mail fraud and conspiracies? It goes to intent to defraud. Each of these defendants was required to give that disclosure, and each person who testified who was from the boiler rooms testified, we did not give that disclosure. And when asked why, they said, because no one would give us money. No one would make a sale after that. So the reason why they didn't give it is because they were trying to cheat people out of money. That's the role that the FTC forms play. I also wanted to briefly touch on Brookhausen, which my colleague mentioned. That case is distinguishable because in the indictment itself, the property interest was not named as money or property. It was about the information about where the products were going. We agree that's not sufficient, but the court didn't say that there was no possible mail fraud in the case. They could have maybe charged it differently, proven different things, and there would have been mail fraud. So Brookhausen is not on all fours with this case. Can I ask you, on page 41 of your brief, you argue that we should review the validity of your theory of fraud for abuse of discretion because it's a question of fact. That didn't really make sense to me. Are you still taking that position? And if so, can you explain it? If I'm recalling correctly, I think we said we review the prosecution theory de novo, but clear error for factual findings related to the theory. I think, I'll pull it up. I mean, I think you were saying we should not review this general issue de novo is how I understood the argument, and I didn't understand how that could be. To the extent there were factual findings about what the government presented, I think those should be reviewed under a deferential standard. So if there's a question about whether the government's theory was X or Y a trial based off the evidence that they submitted, that would be deferential review. No one made a finding. I mean, what does that mean? Like, aren't we just going to look at the transcript and figure out your theory and then de novo figure out whether it's valid? What fact finding are we going to defer to? In this case, I'm not sure there is a fact finding that you would have to defer to. I think the evidence is clear from the transcript, and I don't believe there's any dispute about what the facts were, what the prosecution tried to prove in this case. It's just that the defendants don't think it was enough. As you say, the issue defendants raised on this appeal is a factual one. Whether the government did or did not proceed on a theory that did not involve traditional property fraud, that is not a question of law, but is a question of fact to be determined by whether the district court's view that the government did present a traditional property fraud theory was clearly erroneous. I don't think... I would say the court could go ahead and review this theory de novo. I don't think there's anything to defer, any findings to defer to here, anything that would require the clear error standard. So the preface is wrong? I think if there were some dispute about what the government offered at trial, I think that would be right. But you're saying you concede there wasn't? There wasn't. Okay. I think the court could proceed de novo here. Okay. Is it your view that the evidence as presented at trial shows that every one of the victims paid an inflated price for toner compared to what they would have paid to their regular supplier? Yes. The evidence at trial did show that both through our experts and through each boiler room operator, they acknowledged that it was up to five times as much as you would pay and no one would buy it unless you were deceiving them. Some of the victims also testified to that. I believe Jessica Palazzolo testified that the reason she noticed there was a problem is because there were absurdly high prices. But as Judge Friedland said earlier, even if there weren't absurdly high prices being charged, the fact that they were posing as a regular supplier and giving them toner that they likely didn't need because it was in their service contract is enough to establish fraud in this case. Well, I guess where I'm going with this is suppose that you had, and I guess your view is that you don't, but suppose that there were a victim who was tricked into buying from the defendants because they thought it was their regular supplier but had an arrangement with the regular supplier under which they had to pay on a per piece basis and the price they paid was not inflated and so the only harm is just, you know, I thought I was buying from A and in fact I was buying from B. If there were evidence of somebody like that in the case, would that be a problem for you? It would not be a problem. That's not this case, but it still would not be a problem. And that's because they would still need to use, or maybe in that case they wouldn't need to use a pitch, but assuming that they used the same pitch, implying that we know your model number, we're your regular supplier, there might be a price increase unless you place an order right now, that's still money changing hands because of deception. So even if inflated prices weren't charged, that would be enough. So you think that deception, even if you're getting the thing that you bargained for at the price you bargained for it and you haven't been misled about what the thing is or what the price is, being deceived about your relationship with the person that you're dealing with is itself being deprived of information about that as a deprivation of money or property? So the deprivation of information would not be the property right at issue. The deprivation of information would be the materially false or fraudulent pretense. The deprivation would be the money that you then paid. So I do think it's enough that even if the fair market value were charged, there would still be fraud, but that assumes that there was an intent to cheat in that case. If there is no intent to cheat, if you're just calling someone up and saying, I'm offering a printer toner at this price, will you buy it? That's fine. When you call someone up and imply you're their regular supplier, they might be more likely to buy because they assume that they know what your needs are and they trust their regular supplier to send good product. So there's still material deception in that case that is causing the money to change hands. But how is that different from the Second Circuit case where you trust them because they're friends with your boss or a relative of your boss? The Second Circuit case examples aren't as fundamentally strong as a business relationship. If you're making a purchase from... If someone refers you and says, I'm a friend of a friend or so-and-so told me to call you, you're not basing your purchase decision on that. You might very well base your purchase decision on someone you've worked with for a long time and you know the business relationship. That's the difference that matters. Can I switch just slightly on the conspiracy element? There's a significant amount of testimony about regular meetings at the Beverly Hills Country Club, which incidentally is neither in Beverly Hills nor Beverly Hills, darn it, is a country club. But how much credence, how much of a role does the government place on the meetings there where they discussed how they were going to deceive people? Perhaps what the FTC's rules were, how to get around them. Would you comment on that, please? They're a piece of evidence. It's not a necessary piece of evidence. We would have been able to prove our case without it. But they are evidence of a conspiracy. And we have evidence in the record of Mr. Michaels discussing problems with complaint rates in those meetings. I believe, if I'm recalling correctly, that Mr. Sinetti, one of the boiler room operators, testified that Mr. Michaels asked him at one of those meetings why his sales were so successful. And he said, I do the clean price increase pitch. So those meetings do matter. It's part of the conspiracy. It shows the links between the participants. They were aware of each other. They were aware that they depended on each other. Because if complaint rates went up for one, the legal scrutiny for all of them would increase. Do we need to assume that they talked about those things at all of the meetings so that we can assume that the people who were there heard that, even if we don't have testimony about the specific day? What do we do with that? You don't need to assume that they were at all of the meetings. But I will say that there was testimony from Anjanette Lester that they were mandatory meetings. I would say there's at least evidence to show that it's likely that they attended these meetings. But even absent pointing out that this defendant attended this meeting where that was said, you can determine from circumstantial evidence that the purpose of the meeting was to keep the conspiracy together, to make sure that everyone was doing what they should and complaint rates weren't getting too high. Because if one domino falls, all of the dominoes fall. Is my understanding correct that one of the things that occurred at at least some of the meetings was if people were unsuccessful with particular accounts, they would swap them or trade them, if you will, to other suppliers to let them take a shot at it? That's correct. I'm not sure that occurred at the meetings, but there was evidence that they would trade so-called dead files. Once a sales company had a victim that no longer wanted to work with them, they would wait a little bit and then recycle it to another sales company to see if the same pitch could be used. And that also shows the conspiracy, the link between the different participants in the case. This is not a rimless hub-and-spoke conspiracy. The participants depended on each other. They were linked to each other. They knew that they were in this together. And if one fell, everyone fell. Is there evidence that each of the conspirators was aware of the FTC consent decree? Yes, because it was included in their service agreements. Each of the defendants signed a service agreement with Mr. Michaels. In that agreement, it said you need to make this FTC disclosure, and the evidence of trial showed that none of them did. Can you explain what the notice of the customer complaints was supposed to show? What element does that relate to? It goes to intent of the fraud. And the reason why it goes to intent of the fraud is some of the defendants were... Some made many calls, like Ms. Virag. Other defendants were operating boiler rooms. And without that evidence, the defendants could have argued to the jury, oh, we were doing everything by the book, but our bad employees were doing these pitches, and we had no idea that they were doing this. Now, but once the complaints were introduced and paired with Mr. Feldman's testimony that the complaints were sent to the boiler room operators, you could no longer say that the defendants didn't know that these fraudulent pitches were happening because the complaint said so. And on the complaints point, I would also point out that although the defendants allege significant prejudice and say that we really relied on the complaints, we didn't. It's a small part of the closing statement. And it's hard to argue that there was prejudice from complaints alleging fraudulent conduct when there were actual victims coming to court telling the jury that there was fraudulent conduct. So I don't think there was any unique prejudice from the complaints. I guess one of the things that troubles me about the case, and I asked one of your colleagues on the other side about this, you've got lots of different victims. All their circumstances are not the same. Some were getting free toner. Some weren't. Some heard one thing. Some heard another. It seems like the government's case is that one size fits all. Maybe it's just under the conspiracy rubric, but would you address the concern that I have here? In other words, do we have to go through each alleged victim and compare each defendant's alleged crimes and tie each one, not we, but you have to do this with respect to each victim? Or is it an overarching conspiracy that we don't have to go that deep? It's an overarching conspiracy where you don't need to go that deep. First, on the free toner point, regardless of whether everyone was receiving free toner, and to Judge Friedland's citations, I would also add 55, 68, and 59, 87 of victims who testified that they were receiving free toner. Even if you put aside the possibility that everyone was receiving free toner,  that there was no reasonable seller of toner who would price toner this way. Do we actually know that? I thought we didn't actually have evidence about all the sales prices of the toner. I believe our expert testified that the prices were unusually high. But was that every single sale? If you can point me to a statement that says, every sale that happened here was way high, that's not something I've understood you had. Multiple cooperators testified that they sold at the max assigned price because that yielded the most profit. But I don't think we know that every sale by every defendant was, do we? It's likely that it was overpriced, and we know that because when Mr. Michaels was giving the sales company the toner, they were paying fair market value or above for that toner. They were buying the toner from Mr. Michaels at the price that their victims would be buying it. It might be a little bit above, but that doesn't mean it's like five times above. Do you have anything that says every one of these was that much above? We don't have evidence of every transaction saying it was that much above, but it's a reasonable inference from the evidence that everyone was selling at prices that were very high because once you have someone on your hook as a victim, why wouldn't you price it that high? So there's at least circumstantial evidence that they were selling above the market rate. And in order to make any sort of profit, it would have to be— It sounds a little circular. I mean, I think you said the reason we think intent to defraud is because the price was so high, but now you're saying we assume they would do a high price because they were trying to defraud or something. I mean, isn't that what you're saying? How is that circular? Maybe some of these people were selling just a little bit too high. It's possible that some people were selling maybe a little bit too high. I don't think it's likely. I think the reasonable inference is the only way to make money from the scheme was to price it substantially higher than the market rate because they were getting the toner at the market rate. But even if it was a little bit above, the victims were still being cheated out of money. The court doesn't need to conduct this victim-by-victim analysis and say this person got free toner, so there's sufficient evidence there, and this person didn't testify about free toner. We know that the prices that the victims were paying were above the market rate, whether that was a little bit above the market rate or very much above the market rate. If the court does not have any other questions on that point, I would like to touch briefly on Mr. Brightman's sufficiency argument. The first thing I would say is the strategy of the defendants in their briefs, in their sufficiency attacks, was to pretend like there was a mini trial and only one or two witnesses testified about their person, and that testimony was insufficient. That's not correct, obviously. There was a very long trial with a lot of people testifying about the conspiracy, and so all of that evidence also comes in against the defendants. For Mr. Brightman's argument regarding Ms. Stander's testimony— Sorry, can I just pause you there? I mean, I think they're arguing that that shouldn't have happened, right? That they were only in individual agreements with GNM and not in a big conspiracy, so that's exactly the problem. So how do you—I mean, the idea that all this evidence came in, what's your response to the idea that that's not how it should have been? Because this was not a rimless conspiracy, and we know that from the fact that these companies were dependent on each other and that they shared a common goal. Their common goal was to sell toner above the market rate, I would argue substantially above the market rate, and the only way to do this was to use a fraudulent pitch and make sure that your complaint rates were low enough. And another way that they depended on each other is there was a lot of testimony that Michaels would give cash advances to companies to make payroll for one week, and the only way he could give a cash advance to one company is by taking money paid to him from another company. There was also evidence that Ms. Virag let— Sorry, can you explain that? Why would that be? Why doesn't he just have profits or something? Why would he need to take money from a different company? It's—only if another company is successful can he pay a company that's not doing well. So that shows that the company is dependent on each other. Or maybe a year ago he was doing well with the same company. I'm not sure why it would have to come from a different company. It doesn't necessarily have to come from a different company, but in practical matters, with the way this conspiracy worked, it would be X company is doing well, we have a cushion, and so I can give you a cash advance right now. But isn't that equally consistent with him just having separate agreements? I mean, I don't see how that shows a relationship among the people he's dealing with as opposed—I mean, it seems equally consistent with separate relationships between him and the various other companies. In combination with everything else, I think it's a factor. But there were other things as well. As Judge Smith pointed out, the companies would trade debt files. That shows that there was a connection to each one. Everyone was— Can you talk about—oh, sorry. If you had more answers, I didn't mean to interrupt. No, no, please. Okay. For Virag specifically, can you talk about how she was connected to the rim of this conspiracy? Because I think it's not that strong. So Virag was connected to the rim, and the best evidence of that is the fact that she knew that they all depended on each other. That's why she lent a telemarketing bond to another seller, because the success of one seller helped the success of all. I would also say she— Sorry, just pause there. Can you explain that? I thought—why do we think she was trying to help someone else with that? I thought she was trying to help this person who didn't have the bond. But what connects that person to the rim? Or explain what you just said. The person, from the way I understand the evidence, the person whom she lent a bond to was part of the conspiracy as well. Is there evidence of that? I think it's an implication from that. Mr. Michaels wasn't—he didn't have a legitimate side business and then a fraudulent business. So I think it's at least a reasonable inference from that fact. I would also— Sorry, do we know that? I mean, was there testimony that the entirety of Michaels' business was this theory? I don't know if anyone phrased it that clearly, but Mr. Feldman's testimony certainly made it seem like there was no other legitimate aspect of this business. I can't think of someone who plainly said, Mr. Michaels only operated a fraudulent business, but I'm sure that would have yielded an objection from the defense anyway. I want to go back to other things connecting Ms. Virack to the conspiracy. She adhered to the same price list and price catalog as everyone else. She received the same memo warning the companies that if complaints got too high, legal scrutiny was going to come their way. So it seems like she says that she was BCC'd, so she wouldn't really have known that other people were getting this. When you receive a BCC email, the only reason to send an email to and from yourself is because there are other people on the email. So it's at least a reasonable inference from that. But she also knew that there were other— I have sent and received lots of BCC emails, and I hope none of those involve criminal conspiracies, but you don't know who the other people are, right? So what is the inference from that? Well, at least the inference from the memo is that it was a memo being sent to multiple people. It wasn't addressed to Ms. Virack. The memo does use a plural kind of we, but why couldn't it just have been GNM and her as we? I don't believe the salutation line was— All of us, I guess us, maybe not we, but— There might be an argument for that if it said, Dear Ms. Virack, here's what I want to tell you, but that's not what the memo said. I would also say she knew that there were other participants and would have known that that memo went to other people because she attended the Beverly Hills Country Club meetings. And Mr. Feldman testified that he recognized her. He immediately recognized her at trial. There was no evidence of anything in particular that was discussed at any of the particular meetings that she was at, is there? No, I don't think there was evidence of what was said at a particular meeting, but there is evidence to show that discussion was had on how to keep the conspiracy alive. So I think, given that they were mandatory meetings, Mr. Feldman immediately recognized her. We could assume that she was involved in some discussions on how to— or at least hearing things on how to keep the conspiracy alive. But this wasn't the only evidence against Ms. Virack. She sealed the deal with her own testimony. She testified that she generally sold at the max assigned price and acknowledged that she was following IDC prices. She was able to stay in business for over a decade despite selling a vastly overpriced product. She didn't use the FTC disclaimer just like everyone else didn't use it. She acknowledged receiving government complaints and she acknowledged the complaints that were introduced at trial and other complaints that were not introduced at trial. She acknowledged her absurdly high return rate. She also showed an eagerness to invoke the fax confirmation form, both with her victims and at trial. And she even told her victims that perhaps there was different telemarketers bothering her. All of that showed her participation in the same conspiracy in the same way as everyone else. There's a remarkable parallelism of the conduct in this case. Everyone was doing the same sort of thing with the same prices. How does the complaints that she received play in our analysis, if any? It puts her on notice that fraudulent conduct was happening and that those two intended a fraud. She testified. She could have said, once I got these complaints, I made sure that everyone was using the FTC disclaimer, which was required by my contract. She didn't say that. In fact, she testified and I believe her husband also testified that they didn't use the FTC disclaimer. So it is evidence of her intent to defraud. On the price catalog, that's what she was BCC'd on. Is it innocuous? What's significant about the price catalog? It's control of prices. Everyone was selling at these same prices. It shows conspiracy. The problem is the conspiracy couldn't lie if people started deviating from these prices. It's why it's so hard to maintain a cartel, because everyone has an incentive to start undercutting everyone else and competing. I don't understand that because these people who were the victims were getting a call from one of these conspirators on your theory. It's not like I don't think your theory is they got calls from five of them who were competing with each other. There was some evidence of that. I thought it was like once they got unhappy with one, they passed it to another. But do we have evidence that five were calling at once and competing with each other? Not five, but there was evidence that Mr. Brightman sent an email saying, this other sales company tried to take my client. I want all of those accounts turned back to me. So there is evidence that they sometimes trampled over each other, and that's also evidence of the conspiracy. These sales companies each had their victims that they laid claim on. Sometimes they would trip over each other. And then once they did, they would send, they would try to sort it out and make sure that their victim stayed their victim. And your theory is that if one of them, when they did that, offered four times the price instead of five, the whole thing would have fallen apart? It would have at least increased competition among the people involved in the conspiracy. And they were trying to avoid that. But it sounds like you think there was some check on that already where they were making sure they weren't trampling each other. Like why would the, I don't know, it doesn't sound to me like that makes any sense that if one of them offered a lower price, this would have fallen apart. Because it sounds like they had other, on your theory, other ways to stop them from competing with each other. They did have other ways. I do think that the price catalog shows control of the conspiracy. Maybe I'm not articulating how, correcting the extent to which it affected the conspiracy, but it is one factor. So I think that the price catalog is not the only evidence. The court does not have to focus just on the price catalog. It's all of these things in combination show the rim to the conspiracy. If the court doesn't have any other questions about Ms. Virag, I wanted to briefly talk about our loss argument and make clear that we preserved our argument that the clear and convincing evidence standard never applies. That's on page 110 of our brief. So I think that argument can be considered by this court. And we didn't waive anything. If the court has no other questions about loss, I'll move over to Mr. Sameka's argument. Maybe you could just summarize your evidence on loss to explain why it meets either standard on your theory. So the loss standard, the loss is actually the way we calculated it was conservative. It only took a four-year time period when we know this conspiracy was going on a lot longer. And it only calculated the profit that the sales companies were making. And that was a reasonable estimate of loss. That's all that was required. And the reason why it was a reasonable estimate is we know that those payouts excluded the product that they were getting from IDC and also excluded a reserve amount. So it was even lower than the amount that these victims were really losing. And then there was also testimony that sometimes penalties would be in those payouts. The reserve was for return? Nominally, yes. I'm not sure that they ever used the reserve for that, but the purpose was told to them that it was for return. Briefly on Mr. Sameka, I think the evidence is quite strong as to him and his engagement in conspiracy and the substantive count. For the substantive count, his theory about another company tripping over him and being the real perpetrator doesn't hold up. It is proof that these companies sometimes tripped over each other, but the fax confirmation form showing a $529 sale to Coastal Distribution was...the fax confirmation for that came a day after the check was mailed. So it makes no sense that a different fax confirmation with a different amount referred to this sale. And it would strain plausibility to think that a payout from IEC that was $112... Sorry, $1214.06 and a check in that same amount referred to two separate transactions. The other evidence as to Mr. Sameka on the conspiracy count, Brandon Fisher testified that he was instructed to make front calls to get this information about model numbers. The only reason you need that is to conduct this fraudulent sales pitch. There's no other legitimate reason for that. He attended the Beverly Hills Country Club meetings. He signed an agreement with Michaels. He was also buying toner at market rate and selling it for prices above the market rate. He was on notice that the fraudulent pitches were happening. All of those things show that he was involved in a conspiracy and his conviction should be affirmed on both of those counts. If the court does not have any other questions... I think not, counsel. All right, thank you very much. Thank you. So, Mr. Coleman and gentlepersons, we're going to proceed in the rebuttals in the same order as before? Yes, I've been told that with the exception of one minute from Ms. Boyce on behalf of Ms. Virag, all the rebuttal has been left to me. Well, there you go. Okay. If that makes it easier. Okay. Is there any rebuttal to the rebuttal? Anybody disagree with that? I think she said she wants two minutes, maybe. You want two minutes? Yeah, and he should get, like, whatever extra was... Yeah. So, let's figure out what we've got here. This is what was left of his original time, but he's got to add together everybody else's except two minutes, basically, right? I think so, yes. I want to be sure you have the correct time here. Is that right? Okay, we're good. All right, please proceed, Mr. Coleman. I think the argument today sums up the problem in this case, and it's continued up until today, and I want to try to explain that. On the Yates claim, the court does not have to find that the evidence was insufficient as to everybody, that everybody gets a judgment of acquittal. The Yates claim would give us a new trial, and the Yates claim is based on was a defective theory of fraud, one defective theory presented to the jury. And I think the government continue to do that today. They want to start off with there were absurdly high prices, and both of these misrepresentations were made, and therefore there's a fraud. But then they slide into, but in the alternative, we can also show that there was a fraud simply because there was a passing of money and there was a deception. And they continue to do that to this day. And then Judge Miller, you know, said, well, what about Guertin? You know, there was an exchange of money there. There was a deception. And maybe they backed off a little bit, but they still do not want to back off that ultimate theory that as long as there's a deception and as long as there's a change of money or property, there is fraud. That is their position that they took it again today. That's what they argued at trial, and that's the problem. That is not fraud. If somebody comes in and says I'm affiliated with your supplier, and that's false, and they pay for toner, and let's assume for our sake that they pay a legitimate price for the toner, it's not absurdly high, and I'll get to that in a minute, that is not fraud under region office supply. It's not fraud under Sadler. It's not fraud under Bruckhausen. It's not fraud under Guertin. It's not fraud under Takaloff. And they don't want to give up that theory, and they didn't want to give that theory up at the trial, and that's why we have an overbroad theory of fraud. So it wouldn't be that we would get judgments of acquittal for everybody, but we should get a new trial where the jury understands that that is not a theory of fraud. That's not a viable theory of fraud. The government claimed that the prices, they have evidence that the prices were five times standard price. Would it be okay, though, if they also proved, if their new theory in your new trial was that these people were getting toner without paying more from their regular suppliers? I believe that the types of misrepresentations that were made here, the regular supplier pitch and the price increase pitch, I don't think that those suffice. I think the price increase pitch is too general. It's puffing. It falls under the puffing cases, and I think that the regular supplier is governed by region office supply. That's our position. But if the court disagrees... But those things in combination with the idea that the background principle is they were getting toner for free, you still think it's not enough? If they were getting the toner for free, that may be enough. The problem, I mean, I disagree, but I understand if the court doesn't want to accept that. I understand that. And you could find that there was overall sufficient evidence in this case, but I still think it's clear that they went forward under an invalid theory, and that is what requires a new trial in this case. The government, again, today, and we talked a little bit about this in Harmless Error, they specifically told you don't go through victim by victim and defendant by... They don't want you to do that. And I think they're giving... They're waiving that type of Harmless Error argument. But one of the reasons why they're doing that is because if you do do that exercise, you will find that... And I'll go back to Mr. Millhiser, my client. There is no evidence that the victim, Ms. Babb, paid five times, four times, three times, even two times the regular market price. She had no complaint about the price of her toner. There was clear evidence that she was not receiving free toner. She was buying it from Office Depot. So... So I don't know if that is how I read her testimony. My understanding is that Office Depot can sometimes be one of these suppliers, and so she says she's usually dealing with them, and then do you regularly... So this is on 5198. We dealt with someone like Office Depot, and did you regularly receive toner as part of your arrangement with that office company? Yes. That sounds like one of these same kind of suppliers. It just happens to be Office Depot. Well, I mean, there was no testimony that I saw that Office Depot provided free toner on some type of per-page basis. Well, what does it mean? Do you regularly receive toner as part of your arrangement with that office company? That's where they usually get their toner from is Office Depot. But the point is that the evidence, there's no clear evidence, and again, we're not talking about sufficiency here. I'm just talking about whether a new trial, whether there's a possibility that the jury convicted under an invalid theory. Even if the court wanted to somehow find that you could maybe imply or infer, I should say, that that somehow meant that she was getting free toner, which I don't think it does, but the question is not sufficiency of the evidence, it's how strong, how overwhelming was the evidence. And Your Honor asked, I think it's a closed case, and you asked the government, what do you think, and he said, no, it's overwhelming. Well, the jury in this case was out as long, if not longer, than the jury in the Yates case. They were out over four days, which is a showing that the jury didn't think this was a slam dunk case. They didn't think it was overwhelming. And when you start to break down the different, when you go victim by victim and defendant by defendant, you don't see, you have some victims who are saying that they thought the price was a good price. It was less than what they paid before. Maybe there is some evidence that some of the cooperating defendants were selling it at absurdly high prices, but they're certainly not over. How do we deal with the argument that they were paying MNN or whatever it's called, the price that consumers would usually pay, so they must have been paying, they must have been charging more than that. How do you respond to that argument? Well, I don't know that they were, I mean, they were getting, I mean, there was a, I guess a wholesale type price that was being paid, but these are retail customers, so they're not necessarily going to be paying. I guess I understood the government to be saying that they were basically paying the retail price to get, that they had to be paying, that they had to be charging above the retail price, because that was what the people in the room were paying. And again, this is like an assumption. That's an inference that they want you to draw. Maybe it's a permissible inference, but is that overwhelming evidence, such that if there was an invalid theory instructed to the jury, that you can say that, no, this is all harmless. The jury, this is clearly overwhelming evidence that they were paying absurdly high prices or somewhat high prices. I don't think that's overwhelming evidence. Maybe there's a sufficient inference, but that doesn't mean that an error of this type of a defective theory is harmless. That would be my position, Your Honor. And then your time is up. Let me ask my colleagues whether either has additional questions. Very well, we thank you. Thank you. The final, the wrap-up. So I'm sorry, I know you want to talk about VREG, but I need to ask you about the footnote, because I found footnote 15, and I do not understand how you're interpreting it. It seems very clear to say you can never apply this. We're saying that we're preserving the argument that clear error never applies. I was referring to the footnote that was in the district court briefing. There's a footnote in the government sentencing position, which was the only place in which, as to Ms. Virag, they dealt with the standard. And there they said that it should be a preponderance standard, that they didn't separately argue that clear and convincing should never apply. We agree it was raised in footnote 15. We agree that it was raised in footnote 15 in the brief here. And why isn't that sufficient? I guess I don't understand your argument that you started with today then. Because they didn't raise it below. And so they have raised it now. They can defend the judgment on any theory. They can, and the court can certainly decide to hold for Lucas if it thinks that's appropriate. As we said, whether or not it's preserved, even if you disagree with us on that, we think that on the evidence they didn't have enough under either standard, and so it should be remanded. But if I could address, if that addresses the court's questions, with respect to Ms. Virag's case, I'd just like to make three quick points in the time that I have left. First, to the point that there are different victims and different facts, which you raised, Judge Smith. Note that here Ms. Virag was only convicted on the conspiracy count and no victim testified against her. That other people may have done bad things is not evidence that she did. Second, to the point that the government said there's at least circumstantial evidence, but the question that we'd ask this court to consider is circumstantial evidence as to whom? We submit that as to Ms. Virag, it is fatally lacking. Third, the government said that the companies depended on each other, but I'd submit that the evidence here showed that they did depend on IDC, which was at the hub, but that there is no evidence that they depended on each other and on the other companies that were part of the spokes. The question was, did Ms. Virag believe that her success depended on the entire venture? And there's nothing to support that or to support the argument here. The government says that, well, she testified that she didn't give the script, but that is not the same as admitting that she made misrepresentations. She denied that she made any misrepresentations, and no victim testified that she had made such a statement to them. For that reason, we submit that this court should reverse. Other questions by my colleagues? We thank all counsel for argument today. The case just argued is submitted, and the court stands adjourned for the day. All rise.
judges: SMITH, FRIEDLAND, MILLER